## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| In re: | Chapter 7 (Involuntary) |
| NECOSAGE, LLC | Case No. 26-00822-5 (DMW) |
| Alleged Debtor. | Related to Docket Nos. 1, 3, 4, 9 |

### ALLEGED DEBTOR'S (I) OBJECTION TO (A) EMERGENCY MOTION FOR APPOINTMENT OF AN INTERIM TRUSTEE AND (B) EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER; (II) MOTION TO (X) CONVERT TO A CASE UNDER CHAPTER 11 AND (Y) TRANSFER TO PROPER VENUE; AND (III) CONDITIONAL CONSENT TO ORDER FOR RELIEF

NecoSage, LLC ("*NecoSage*" or the "*Alleged Debtor*"), by and through its undersigned counsel, hereby (i) objects to (a) the *Emergency Motion for Appointment of an Interim Trustee Pursuant to 11 U.S.C. § 303(g)* [Docket No. 3] (the "*Trustee Motion*") and (b) the *Motion for Temporary Restraining Order* [Docket No. 9] (the "*TRO Motion*"); (ii) moves for entry of an order (x) converting this Chapter 7 Case (defined below) to a case under chapter 11 of the Bankruptcy Code, and (y) transferring the converted chapter 11 case to the United States Bankruptcy Court for the District of Delaware (the "*Delaware Bankruptcy Court*"); and (iii) conditionally consents to the Order for Relief.   In support hereof, NecoSage respectfully states as follows:

### INTRODUCTION

1.      This Chapter 7 Case was not filed in good faith.  It was instead commenced by impatient and frustrated creditors who are seeking to disrupt, or perhaps gain leverage in, NecoSage's restructuring process.  Not satisfied with letting the process for filing an involuntary bankruptcy play out, their ringleader and organizer, Endgame, which holds a *disputed* claim (rendering it unable to serve as a petitioning creditor for filing an involuntary bankruptcy petition

under the Bankruptcy Code (defined below)), also seeks the appointment of an interim trustee—an extraordinary and wholly unwarranted remedy.  Far from clearing the evidentiary hurdle courts require to grant this extreme relief, the Trustee Motion relies entirely on the declaration of a disgruntled former employee of Vantorq/Alliance, NecoSage's investment management company, who offers a string of demonstrably false and unsupported accusations against NecoSage's president.  Based on that motion, Endgame also obtained, but then failed to properly serve, a temporary restraining order that has halted the Alleged Debtor's operations and distracted from its preparations for a chapter 11 reorganization.

2.      The Petitioning Creditors' tactics in thrusting NecoSage into an involuntary chapter 7 case and compelling it to defend against spurious allegations have caused nothing but unnecessary cost and delay.  Nonetheless, NecoSage is in need of bankruptcy protection.  Long before the Petitioning Creditors filed their involuntary petition, NecoSage had engaged bankruptcy counsel and installed a chief restructuring officer, who secured debtor-in-possession financing to formulate a restructuring plan under chapter 11 of the Bankruptcy Code.  Over the past few months, NecoSage has been negotiating with this potential lender and working with counsel to structure an orderly and comprehensive restructuring that will maximize the value of its assets for the benefit of all stakeholders.  For that reason, NecoSage seeks to have this Chapter 7 Case converted to a case under chapter 11 and, if converted, will not contest entry of an order for relief here.

3.      Additionally, this case was improperly filed in a venue with which the Alleged Debtor has virtually no contacts.  In fact, NecoSage's *only* connection to North Carolina is that its President resides there.  Because North Carolina is not NecoSage's principal place of business, and because NecoSage's affiliate, Urban Red, has a chapter 11 case with proper venue pending in

the Delaware Bankruptcy Court, NecoSage seeks to transfer this case to the Delaware Bankruptcy Court for joint administration with Urban Red.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Eastern District of North Carolina (the "*Court*") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference from the United States District Court for the Eastern District of North Carolina, dated August 3, 1984.

5.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

6.      For the reasons discussed below, venue in this Court is improper pursuant to 28 U.S.C. §§ 1408 and 1409 and should be transferred to the Delaware Bankruptcy Court.

7.      The statutory predicates for the relief requested herein are section 1408 and 1412 of title 28 of the United States Code, sections 303(g) and 105(a) of title 11 of the United States Code(the "*Bankruptcy Code*"), and Rules 1014, 1017, and 9013 of the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*").

## BACKGROUND

### NecoSage's Business

8.      NecoSage is a private equity fund that owns a portfolio of companies (the "*Portfolio Companies*"), including Urban Red LLC ("*Urban Red*"), which currently has a chapter 11 case pending in the Delaware Bankruptcy Court.[1]

9.      NecoSage's corporate headquarters are located in Vienna, Virgina.

---

[1] *See In re Urban Red, LLC*, Case No. 26-10283, United States Bankruptcy Court for the District of Delaware.

10.     To benefit from economies of scale, NecoSage provides[2] management services and issues intercompany loans to the Portfolio Companies and arranges and pays for certain common expenses for the Portfolio Companies.

11.     NecoSage is in turn managed by investment manager Vantorq Capital Management (previously known as Alliance Investments Management LLC) ("*Vantorq/Alliance*") pursuant to a certain *Investment Management Agreement* dated July 1, 2024 between NecoSage and Vantorq/Alliance (the "*Investment Management Agreement*"). A copy of the Investment Management Agreement is attached hereto as **Exhibit A**.

12.     Pursuant to the Investment Management Agreement, Vantorq/Alliance employs staff to operate NecoSage's business and bills NecoSage for staffing services, at cost.

13.     NecoSage's business operations are run from Pakistan.  Previously, those operations were supported by up to30 staff members.  In light of its restructuring efforts (discussed in detail below), NecoSage is currently supported by the following six fulltime staff members in Pakistan, who, other than Usman Ahmed Cheema, are responsible for all of NecoSage's business operations:

- ***Usman Ahmed Cheema, Head of Operations & People***:  Leads full administrative oversight of the offshore office, ensuring operational efficiency and governance alignment with headquarters; oversees recruitment, staffing strategy, and workforce planning across functions; coordinates administrative and reporting support for the Portfolio Companies; acts as the central liaison between offshore teams, Portfolio Company leadership, and parent company management; manages vendors, facilities, infrastructure, and compliance with labor and regulatory requirements; supports process standardization and operational execution across entities.

- ***Sannan Tahir, Head of Financial Planning & Analysis***:  Leads financial planning, budgeting, forecasting, and variance analysis across the Portfolio Companies; oversees performance reporting and board-level financial presentations; drives cash flow planning, liquidity management, and capital

---

[2] In compliance with this Court's entry of the TRO (as defined below), and until the TRO expires or is dissolved by this Court, NecoSage's operations described herein are currently stayed.

allocation analysis; supports the deal team with acquisition modeling, valuation analysis, scenario planning, and return metrics; conducts financial due diligence support and post-acquisition performance monitoring; develops financial frameworks to optimize operational profitability and margin expansion.

- ***Qamar Abbas, Sr. Manager Investor Relations***: Manages all investor communications including reporting, updates, and performance summaries; oversees capital call and distribution coordination processes; prepares investor presentations, quarterly reports, and financial disclosures; serves as primary liaison between management and LPs/investors; supports fundraising initiatives and due diligence processes for prospective investors; maintains investor databases and ensures regulatory-compliant communications.

- ***Aiman Aftab, Business Development Manager***: Leads business development and acquisition origination aligned with the firm's growth strategy; develops relationships with brokers, intermediaries, and business owners; builds and manages the firm's qualified deal pipeline; conducts preliminary screening, valuation benchmarking, and strategic fit analysis; coordinates early-stage negotiations and transitions opportunities to the deal execution team.

- ***Mohsin Ali, Head of Accounts***: Oversees all bookkeeping, general ledger management, and financial record integrity; ensures timely monthly, quarterly, and annual financial closings; manages statutory compliance, taxation filings, and regulatory reporting; coordinates audits and liaises with external auditors and tax advisors; implements accounting policies and internal controls across entities; ensures compliance with applicable accounting standards and local regulations.

- ***Haseeb Asif, Senior Legal Associate***: Manages all corporate legal documentation, filings, and record maintenance; supports in-house counsel in drafting, reviewing, and organizing contracts and agreements; coordinates with external counsel on transactions, disputes, and regulatory matters; maintains corporate governance records and compliance calendars; assists in transaction documentation for acquisitions and exits; ensures proper documentation control and legal process tracking.

14.    In addition to its core team in Pakistan, NecoSage previously had up to five employees providing support from Vantorq/Alliance offices in North Carolina, which Vantorq/Alliance closed last fall, and individual staff located in Georgia, Arizona, Florida, Pennsylvania, New York, and New Mexico. Currently, there are no staff in any of these locations (and there has not been in quite some time). Petitioning Creditor Haus, who previously served as

controller for Vantorq/Alliance and provided services to NecoSage, was based in Wilmington, North Carolina.

15.     Previously,[3] NecoSage has been managed by its President and Director, Farooq Cheema ("*Cheema*") and its Board of Managers:  Cheema, Muhammad Hussain, and Qamar Abbas (collectively, the "*Board*").[4]  Cheema is a resident of North Carolina.

16.     Cheema is also President of Vantorq/Alliance.  However, NecoSage does not own any equity in Vantorq/Alliance and Vantorq/Alliance does not own any equity in NecoSage.  NecoSage and Vantorq/Alliance are only related through the Investment Management Agreement.

**NecoSage's Efforts to Commence a Chapter 11 Case**

17.     In the fall of 2025, due to various macro, operational, and legal challenges, NecoSage experienced financial distress and its asset portfolio was not able to fund current operations or pay liabilities.  On November 12, 2025, Vantorq/Alliance sent an email update to NecoSage's investors (the "*November 12 Email*"), explaining that NecoSage was "in a severely distressed position and ha[d] critical liquidity needs."  A copy of the November 12 Email is attached hereto as **Exhibit B**.

18.     The November 12 Email further explained that NecoSage was evaluating alternatives, including proceeding with a restructuring or sale of a significant asset.  *Id.*  At that time, certain large investors opposed an asset sale and had formed what they termed an "Investor Committee" that was considering providing funding to NecoSage to ensure that NecoSage could

---

[3] Cheema resigned as president in November 2025 but was reinstated in December, without salary. As discussed in detail below, at that time, the Board appointed a chief restructuring officer to lead NecoSage through a restructuring process.

[4] Contrary to Endgame's false assertion in the Trustee Motion, Cheema is not the "sole director/manager" of NecoSage.  *See* Trustee Motion ¶ 13.

retain all profitable assets. *See id.*  On information and belief, Petitioning Creditor Endgame was a leading member of the Investor Committee.

19.     The November 12 Email further stated that "[t]he Board has been meeting multiple times per week and is fully committed to its fiduciary duty to achieve the best possible outcome. We expect to adopt a definitive plan as quickly as circumstances allow."  Ex. C at 2.

20.     At or around this time, NecoSage retained Michael DiRende ("*DiRende*"), a restructuring advisor, to evaluate restructuring options.  On November 15, 2025, DiRende and NecoSage held an Emergency Meeting of Investors and presented a "Strategic Options Analysis" (the "*Investor Presentation*").  A copy of the Investor Presentation is attached hereto as **Exhibit C**.  As laid out in the Investor Presentation, DiRende explained that NecoSage was in dire financial condition and reviewed the various options being explored by the company and its Board.  The Investor Presentation discusses potential sales of assets and invites proposals to the Board from creditors.

21.     On December 3, 2025, NecoSage's Board of Managers held a meeting, in accordance with its fiduciary duty, in which they approved, *inter alia*, NecoSage's engagement of bankruptcy legal counsel and a specialist seasoned restructuring advisor and fiduciary to direct and guide NecoSage through a restructuring process that comports with the board and company's duties and applicable law.  Minutes from the December 3, 2025 Meeting of the Board of Managers of NecoSage (the "*Minutes*") are attached hereto as **Exhibit D**.

22.     On that same date, NecoSage and Urban Red retained restructuring counsel, Goldstein & McClintock LLLP ("*G&M*"), to advise and represent them in a financial workout and potential bankruptcy filing.

23.     On December 5, 2025, NecoSage engaged Albert Kirchhein of AK Restructuring, LLC ("*AK Restructuring*") to serve as the Chief Restructuring Officer and Financial Advisor for NecoSage and Urban Red (the "*CRO*").  A copy of the *Declaration of Albert Kirchhein in Support of Alleged Debtor's (i) Objection to (a) Emergency Motion for Appointment of an Interim Trustee and (b) Emergency Motion for Temporary Restraining Order; (ii) Motion to (x) Convert to a Case under Chapter 11 and (y) Transfer to Proper Venue* (the "*CRO Declaration*") will be filed substantially contemporaneously (*i.e.*, the morning of March 2, 2026).

24.     AK Restructuring is a turnaround and restructuring advisory firm. AK Restructuring works in close collaboration with company management to implement strategies to effectively restructure businesses which are considering or have declared chapter 11 bankruptcy.

25.     The CRO, Al Kirchhein, is a seasoned restructuring professional with over 25 years of experience in financial restructuring, crisis management, and coordinating dispositions of underperforming or highly leveraged companies, and his decades of experience include large, national restructuring firms (including, without limitation, Glass Ratner). He is an expert in strategic planning, cash-flow forecasting, cash management, the preparation of business plans and ongoing monitoring of liquidations and is thus well-equipped to serve as NecoSage's Chief Restructuring Officer.

26.     The CRO is also deeply experienced with bankruptcy and restructuring engagements, in particular. For example, he has served as trustee in numerous chapter 11 and chapter 7 cases. He has also been the primary financial advisor to parties in interest in numerous complex, multinational restructuring matters in industries including retail, banking, health care, distribution and manufacturing.  He specializes in crafting effective restructuring plans and executing in a manner that maximizes the outcomes to critical stakeholders.

27.     Since his appointment, the CRO has worked to assist NecoSage in securing a lender to provide debtor-in-possession financing, to develop a reorganization process, and to understand and monitor the liquidity needs of the business and identify opportunities to improve performance and liquidity.

28.     The CRO, in conjunction with NecoSage's counsel, has been engaged in preparing an organized and orderly Chapter 11 filing, and is working towards a process to implement an organized Chapter 11 process and exit.  *Unfortunately, the alleged creditor leading the charge on the involuntary bankruptcy petition and affiliated motion practice has ulterior motives which are divergent from the interests of the creditor body of NecoSage and its affiliates as whole, and is attempting to improperly use this Court and a venue convenient to that purported creditor (but improper for this bankruptcy case) to its own advantage.*

29.     AK Restructuring is registered in Florida and its offices are located at 300 N Highway A1A, Unit I 301, Jupiter, FL 33477. The CRO operates from AK Restructuring's offices in Jupiter, Florida.

30.     On January 18, 2026, NecoSage approved resolutions appointing the CRO to serve as the authorized representative for NecoSage in the company's chapter 11 case and granted him decision making authority over NecoSage.  A copy of the signed *Written Consent to Action with Meeting of the Board of Managers and the Class B Member of NecoSage, LLC* (the "*Resolutions*") is attached hereto as **Exhibit E**.  Specifically, the Resolutions authorize the CRO "to take any and all action that it deems necessary or proper to obtain appropriate relief for the Company, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's business[.]"  Resolutions at 1-2.

**The Involuntary Petition**

31.     On February 24, 2026, (the "*Petition Date*"), certain alleged creditors of NecoSage (the "*Petitioning Creditors*") filed an involuntary petition (the "*Involuntary Petition*") for relief under chapter 7 of the Bankruptcy Code (the "*Chapter 7 Case*").   The Petitioning Creditors are Endgame Holdings, LLC ("*Endgame*"), Harry Haus ("*Haus*"), and Raman Gulati ("*Gulati*").

32.     Endgame, the Petitioning Creditor that appears to be organizing and driving the involuntary petition and accompanying motions (and the only one of the Petitioning Creditors who has counsel that appears on those pleadings), not only has motives that diverge from those that are in the best interest of the Debtor and the Debtor's creditor body as a whole, but also has an explicitly disputed claim (which dispute was reflected in writing prior to the filing of the involuntary petition, not only rendering Endgame ineligible to file an involuntary petition, but also exposing it to liability for its improper action herein).[5]   On December 12, 2025, in-house counsel to Vantorq/Alliance sent a letter by email on behalf of NecoSage to Endgame's manager, Michael Dienhart, notifying him that NecoSage "possesses causes of action, rights to recoupment and set-off, and defenses on the basis of, without limitation, intentional interference with contract, intentional interference with prospective business advantage and defamation, to any claim you may have against NecoSage." *See* Email to Michael Dienhart dated December 12, 2025 (the "*December 12 Email*"), a copy of which is attached hereto as **Exhibit F**.  The December 12 Email also informed Dienhart that "NecoSage accordingly disputes some or all of any amount that you assert is owed to you by NecoSage." *Id.*

33.     Despite the disputed nature of its claim, Endgame, in direct contravention of the Bankruptcy Code, proceeded to seek involuntary bankruptcy relief against NecoSage.

---

[5] All rights and remedies, without limitation, in regard to such improper action are explicitly reserved.

**The Trustee Motion, Kim Declaration, and TRO Motion**

34.    On February 24, 2026, premised on unsupported allegations of fraud, theft, and mismanagement against Cheema, Endgame filed the Trustee Motion, seeking the appointment of an interim trustee in this Chapter 7 Case pursuant to 11 U.S.C. § 303(g).  Endgame erroneously claims that Cheema exercises "pervasive and unchecked control" over NecoSage and has looted and diverted funds from Portfolio Companies.  *See* Trustee Motion ¶ 2.

35.    The Trustee Motion is based exclusively on the attached declaration of an admittedly disgruntled former employee *of Vantorq/Alliance* (not NecoSage), Tommy Kim ("*Kim*").  *See Unsworn Declaration under Penalty of Perjury pursuant to 28 U.S.C § 1746* [Docket No. 4] (the "*Kim Declaration*").  Until November 4, 2025, Kim was Vantorq/Alliance's chief investment officer.

36.    Putting aside the ***complete and absolute irrelevance*** of Kim's unfounded allegations (given that NecoSage, long ago, appointed an independent career fiduciary and restructuring specialist, Al Kirchhein, to direct NecoSage's restructuring process, as well as seasoned Chapter 11 counsel to guide NecoSage through its Chapter 11 filing), Kim's Declaration is rife with hearsay and self-serving, unfounded allegations.

37.    For example, while many of Kim's allegations are aimed at Cheema in his role as director of Vantorq/Alliance or at Vantorq/Alliance's operations generally, and not NecoSage, the Kim Declaration does assert the following incorrect statements and allegations relevant to Cheema's management of NecoSage or the veracity of Kim's testimony:

- That NecoSage is a subsidiary of Vantorq/Alliance. *See Kim Declaration* ¶ 4. NecoSage is a wholly distinct entity, connected to Vantorq/Alliance only through the Investment Management Agreement and some similar equity holders, as demonstrated by Kim's own exhibit to his declaration. *See Kim Declaration* Ex. C.

- That Kim was wrongfully terminated from his employment at Alliance, without cause or explanation. *See id.* ¶¶ 10-11.  In fact, Kim was terminated for cause, including

missing key meetings despite multiple warnings, as well as erratic behavior in the office and representing that he had talked to investors when he had not. Kim received multiple emails regarding his performance issues and at one time admitted that he did not know what the financials were for NecoSage, raising concerns that he may have been giving investors false information. Attached hereto as **Exhibit G** is an email from Cheema to Kim dated September 17, 2025, discussing Kim's performance issues (the "*September 17 Email*"). The September 17 Email is a sample of numerous emails in which Kim was provided with warnings about his poor job performance.

• That the amounts paid to Vantorq/Alliance from NecoSage and its subsidiaries over a period of years were somehow grossly negligent, fraudulent, "misrepresentation" and poor investment management. *See id.* ¶¶ 20-22; Ex. C. In fact, such amounts were earned fees, paid pursuant to the terms of the Investment Management Agreement. Kim purports to provide "analysis" to support these claims in Exhibit C to the Kim Declaration but that exhibit only sets forth the corporate organizational structures of Vantorq/Alliance and NecoSage and related entities.

• That Cheema resigned on November 13, 2025 but is still actively directing managers in the performance of their duties at NecoSage and "raid[ing] operating entities." *See id.* ¶¶ 23-26, 65. In fact, as set forth in the Minutes, while Cheema did resign in November, he was reinstated by the Board in December 2025. *See* Minutes, **Exhibit D**. Kim also makes this false allegation even though his employment with Vantorq/Alliance was terminated on November 4, 2025, thus purporting to have knowledge of Cheema's management of NecoSage after his termination. There is also no support for Kim's assertion that Cheema has been "raiding" the Portfolio Companies.

• That, upon Kim's "information and belief," formed more than three months after he ceased working for Vantorq/Alliance, "employees" of unspecified companies "are being paid through accounts maintained by NecoSage-held operating entities without any agreement between the operating companies and these employees with respect to the scope of their work or the basis for their compensation." *See id.* ¶ 27. To the extent it can be gleaned from this paragraph that Kim is asserting some kind of mismanagement of *NecoSage*, this allegation is nothing but conjecture.

• That Cheema is under investigation by the SEC. *See id.* ¶ 30-31. In fact, as Kim is well aware, Cheema is not under investigation. In 2024, the SEC commenced an inquiry into Vantorq/Alliance and one of the Portfolio Companies, and to date has taken no legal action against any of them. Neither Cheema nor NecoSage is the target of that investigation.

• That Cheema directed "employees" to prioritize payments to certain investors and creditors. *See* ¶ 33. In fact, prior to his termination, Kim was the chief investment officer of Vantorq/Alliance and was the decision-maker regarding payment priority.

• That Cheema prioritized using the proceeds from the sale of one of the Portfolio Companies, Envision Dental, to pay Alliance's expenses ahead of Envision Dental's creditors. *See id.* ¶ 34. In fact, Kim was an integral part of the negotiations regarding the

sale of Envision Dental and helped formulate the plan for the flow of proceeds from that sale.

- That Cheema stated that he would "never pay certain creditor claims based on his personal animus against" them. *See id.* ¶ 46. In fact, as noted above, Kim was the chief investment officer of Vantorq/Alliance and was the decision-maker regarding payment priority.

- That Cheema, through Vantorq/Alliance, hired Mr. DiRende, a restructuring expert, to benefit himself personally "at the expense of NecoSage's creditors and equityholders." *See id.* ¶ 47. In fact, as an investment management company providing services to NecoSage, Vantorq/Alliance engaged employees and contractors in various roles to provide services to NecoSage, which were billed to NecoSage, pursuant to the Investment Management Agreement, at cost. Notably, Mr. DiRende held multiple meetings with creditors where he revealed that NecoSage was in dire financial condition and he reviewed with them various options being explored by the Company and its Board. His presentation included discussion of potential sales of assets and invited creditors to form a committee to make proposals to the Board. *See Investor Presentation*, **Exhibit C**.

- That Cheema rejected "arms-length [*sic.*] offers" to purchase the assets of one of the Portfolio Companies in favor of a less-favorable insider deal that he had arranged. *See Kim Dec.* ¶ 49. In fact, Kim led the negotiations on this potential transaction and NecoSage rejected the arm's-length offers based on Kim's input that the purchaser would not be able to obtain the necessary financing.

- That, at various times, often *after* Kim's employment was terminated, Cheema instructed employees to withhold or directly withheld information from investors, "raided" assets of NecoSage and the Portfolio Companies, failed to pay employees of NecoSage when there was money to do so but instead paid himself, promised guaranteed returns to investors and sold securities to unaccredited investors, endeavored to implement a restructuring plan that would harm creditors, directed Alliance to charge NecoSage for investment management fees for services that Vantorq/Alliance never provided, and prevented honest disclosure of the financial state of NecoSage to investors. *See id.* ¶ 35, 36, 40, 51-53, 56, 58, 59. In fact, given NecoSage's distressed circumstances, *no* investor distributions were made, nor was any money raised after Kim was terminated. Nor were significant funds raised during Kim's employment. Despite this, employees of Vantorq/Alliance have always been paid.

- That Cheema falsified a statement to the police related to Kim's failure to return his company laptop. *See id.* ¶ 66.[6] In fact, Cheema filed a police report related to Kim's

---

[6] Kim's claims against Cheema in this paragraph also betray his true motivation for making his declaration: to retaliate against Cheema because Kim believes that he was wrongfully terminated despite his own poor performance. *See id.* ("I may file a counter complaint to Raleigh Police that Mr. Cheema has falsified statement to Raleigh Police on this incident, which is a crime and can be a Class 2 Misdemeanor in North Carolina. Any crime on Mr. Cheema's record will build as his personal liability that can be used against him and can result in expulsion from the U.S. after justice

failure to return his company-issued *phone*, not laptop.  On November 8, 2025, Vantorq/Alliance's chief of staff, Greg Snow, contacted Kim regarding the return of the phone.  Kim stated that the phone was lost but that, if he could not locate it by Tuesday, the company could charge him the full replacement amount. Upon learning this, Cheema stated that Kim had until noon that same day to locate the phone or Cheema would file a police report. Cheema was concerned about Kim's apparent refusal to return the phone, which contained company data. Cheema filed the police report for the stolen phone and Kim located it three days later.

38.     Contemporaneously with the Trustee Motion, Endgame filed the TRO Motion, asserting that, "[a]s detailed in the Interim Trustee Motion," immediate injunctive relief "is necessary to preserve the Court's ability to adjudicate the Interim Trustee Motion, as well as prevent further erosion of estate value before a trustee can be installed."  *See* TRO Motion ¶¶ 3-5.

39.     On February 25, 2026, following a telephonic hearing on the TRO Motion, of which counsel for NecoSage was not aware and thus did not attend, the Court entered a Temporary Restraining Order (the "*TRO*") temporarily enjoining NecoSage and related parties from, *inter alia,* transferring fund or assets until a further hearing on the TRO.  *See* TRO ¶¶ 1-2.

40.     The TRO specifically states that "Counsel for Endgame is directed to attempt to obtain **in person service** of this Order and all pleadings to date at a physical address occupied by Mr. Cheema."  *Id.* ¶ 3 (emphasis added).

41.     On February 26, 2026, Cheema's wife received copies of the TRO, TRO Motion, Trustee Motion, Involuntary Petition, and related docket entries at Cheema's home address sent by FedEx.  At the time, Cheema was out of state and was not immediately aware of the contents of the FedEx package.

42.     As of the date of this motion, *neither the TRO nor the Involuntary Petition have even been properly served on NecoSage.*

---

has been served, compensations have been made to victims, and he has served his time for his crimes.")

**RELIEF REQUESTED**

43.    NecoSage seeks entry of orders, pursuant to sections 105(a) and 303(g) of the Bankruptcy Code and Bankruptcy Rules 1014 and 1017 (i) denying the Trustee Motion and dissolving the TRO; and (ii) converting this Chapter 7 Case to a case under chapter 11 of the Bankruptcy Code and transferring the converted chapter 11 case to the Delaware Bankruptcy Court.

**BASIS FOR RELIEF**

**I.    THE TRUSTEE MOTION SHOULD BE DENIED AND THE TRO DISSOLVED BECAUSE THE TRUSTEE MOTION IS UNFOUNDED AND MOOT.**

44.    The relief sought in the Trustee Motion is practically moot because NecoSage conditionally consents to entry of the Order for Relief.  In any event, the appointment of an interim trustee is unwarranted because it is based on unfounded allegations against Cheema and, in any event, NecoSage has already appointed an independent chief restructuring officer with the same fiduciary duties that a trustee would have, who is overseeing NecoSage's restructuring.

45.    Section 303(g) of the Bankruptcy Code provides:

> [a]t any time after the commencement of an involuntary case under chapter 7 of this title ***but before an order for relief in the case***, the court, on request of a party in interest, after notice to the debtor and a hearing, and ***if necessary to preserve the property of the estate or to prevent loss to the estate***, may order the United States trustee to appoint an interim trustee under section 701 of this title to take possession of the property of the estate and to operate any business of the debtor.

11  U.S.C. § 303(g) (emphasis added).

46.    Appointment of an interim trustee is an extraordinary remedy that requires ***proof***— and not mere allegations—that "irreparable harm to the estate is likely to result between the time of the filing of the petition and the scheduled hearing."  *See In re Carolina Constructors & Invs.*, LLC, No. 20-02040-HB, 2020 Bankr. LEXIS 1523, at *5 (Bankr. D.S.C. May 21, 2020)

("Petitioning Creditors have failed to demonstrate grounds sufficient to grant the extraordinary request [for relief under § 303(g)."); *In re Reed*, 11 B.R. 755, 757 (Bankr. S.D.W. Va. 1981). While the appointment of an interim trustee under section 303(g) is an "extreme remedy," that should only be imposed where there is "an exceptionally strong need for doing." *In re Diamondhead Casino Corp.*, 540 B.R. 499, 505 (Bankr. D. Del. 2015). Importantly, "lack of trust in management or frustration with the lack of progress on the development of the Property, no matter how justified, does not suffice to warrant an interim trustee[.]" *Diamondhead*, 540 B.R. at 508.

47.     Here, the established ***facts*** demonstrate that the extraordinary relief provided in section 303(g) is far from warranted:  an interim trustee is not necessary to preserve the value of the estate because the CRO is working to do just that (and, obviously, the board's long-prior appointment of the CRO evidences that the board and NecoSage, who are being advised by bankruptcy counsel, appropriately exercised their fiduciary duty). As a preliminary point, NecoSage conditionally consents to entry of an order for relief upon conversion of this case to a case under chapter 11 of the Bankruptcy Code, *see infra* at ¶¶ 47, *et seq.*, so there is no risk of any *interim* harm to the estate.

48.     But as further evidence of Endgame's bad faith in its involuntary bankruptcy filing and associated motion practice, Endgame's allegations of fraud, mismanagement, and theft leveled at Cheema in the Trustee Motion are baseless.  Remarkably, the entire Trustee Motion seems to posit that the mere fact that Cheema controlled both NecoSage and Vantorq/Alliance constitutes proof of wrongdoing.  But just because Cheema's dual roles in two *separate* companies make it *possible* to improperly divert funds from one to another *does not demonstrate that Cheema has or would* engage in any such conduct.

49.     The argument section in the Trustee Motion does not cite to a single supporting fact; it relies instead on three flimsy paragraphs of conjecture.  Endgame asserts, without support, that Cheema will "raid the subsidiary bank accounts" when there is no evidence that Cheema has or would do so, only bald accusations in the Kim Declaration.  *See* Trustee Motion ¶ 20; Kim Declaration ¶¶ 25, 29 65.  Endgame further claims that "[t]here is no independent board or committee at NecoSage to review or challenge Mr. Cheema's decisions" when there is, in fact, a Board on which Cheema has only one of three votes.  *Id.* ¶ 21.  And Endgame baselessly asserts that the "concentration of power" in Cheema "has resulted in a complete breakdown of corporate governance and internal controls" despite the existence of the Board, and documented evidence of regular Board meetings (*see* Minutes, **Exhibit D**) and Board actions, including through communications with investors (*see* November 12 Email, Investor Presentation*, **Exhibits B and C**) and the engagement and appointment of G&M and the CRO (*see* Resolutions, **Exhibit F**)).

50.     In any event, NecoSage is now (and has been since December) overseen by the CRO. *See, generally,* CRO Declaration.  Since his appointment, the CRO has worked to assist NecoSage in securing a lender to provide debtor-in-possession financing, to develop a reorganization process, and to understand and monitor the liquidity needs of the business and identify opportunities to improve performance and liquidity.  Additionally, the CRO is authorized to take any and all action that he deems necessary or proper to shepherd NecoSage through a restructuring process while maintaining NecoSage's ordinary course business operations.  There is no risk of loss to the estate.

51.     In effect, Endgame asks this Court to impose the extraordinary remedy of installing an interim trustee in an attempt to hijack the Debtor's control for Endgame's own self-serving purposes, despite the existence of a CRO that is empowered to and has been overseeing the

company's operations and liquidity, to take immediate possession and full control of NecoSage and all of its assets, simply because Endgame says so.  *See* Trustee Motion ¶¶ 20-22.  Endgame has not and cannot provide any proof that "irreparable harm to the estate is likely to result between the time of the filing of the petition and the scheduled hearing."  *Reed*, 11 B.R. at 757 (denying motion to appoint interim trustee where "no facts were alleged in the application showing the necessity for the appointment of an interim trustee[.]").

52.     Because there is no basis to appoint an interim trustee, particularly in light of NecoSage's appointment of an independent, experienced CRO who has been working to formulate a restructuring process that maximizes value for all stakeholders, the TRO should be dissolved and the TRO motion should be denied.

## II.     MOTION TO CONVERT TO CHAPTER 11 AND TRANSFER VENUE

### a.   The Alleged Debtor Is Entitled to Convert this Case to a Case Under Chapter 11.

53.     Under applicable bankruptcy law, NecoSage has a right to convert this Chapter 7 Case to a case under chapter 11 of the Bankruptcy Code.

54.     Section 706(a) of the Bankruptcy Code provides that a chapter 7 debtor "may convert a case under this chapter to a case under chapter 11 … of this title at any time, if the case has not" already been converted from chapter 11.  *See* 11 U.S.C. § 706(a).  This one-time right to convert is generally considered an "unbridled right."  *See In re Premier Gen. Holdings, Ltd.,* 427 B.R. 592, 600 (Bankr. W.D. Tex. 2010) ("the chapter choice made by the petitioning creditors" in an involuntary bankruptcy filing does not control) (citing 11 U.S.C. § 706(a); H.R. Rep. No. 595, 95th Cong, 1st Sess 390 (1977) (debtor has a one-time absolute right of conversion of a liquidation case to a reorganization case)).[7]

---

[7] The only exception to this right to convert is practically inapplicable in this case. Under section 706(d) of the Bankruptcy Code, "a case may not be converted to a case under another chapter of

55.     In the context of involuntary Chapter 7 cases, courts have recognized that section 706(a) allows the debtor to convert the case to Chapter 11 even before an order for relief is entered, which effectively transforms the case into a voluntary Chapter 11 proceeding, and without the need for a separate hearing. *See In re Omaha Midwest Wholesale Distributors, Inc.,* 94 B.R. 157 (1988) (citing 6 Collier on Bankruptcy P 706.01). Moreover, Bankruptcy Rule 1017(f)(2) provides that conversion pursuant to section 706(a) requires a motion filed and served pursuant to Bankruptcy Rule 9013, which in turn requires a written motion "but does not require notice for any such motion which may be considered ex parte." *Omaha,*, 94 B.R. at 158 (citing Bankruptcy Rules 1017 and 9013).

56.     Additionally, where, as here, the underlying question is whether the debtor belongs in chapter 11, bankruptcy courts will convert a case to chapter 11 (or deny a motion to convert from chapter 11 to chapter 7) when it is "in the best interest of Debtor, and all interested parties for Debtor to remain in a chapter 11." *See Kearney v. Unsecured Creditors Comm.*, 625 B.R. 83, 101 (B.A.P. 10th Cir. 2021) (citing section 706(b) of the Bankruptcy Code).  Because the Bankruptcy Code allows the Bankruptcy Court to "convert a case under [chapter 7] to a case under

---

this title unless the debtor may be a debtor under such chapter."  11 U.S.C. § 706(d).  The Supreme Court has interpreted section 706(d)'s exception as applying whenever a debtor is ineligible for relief under the chapter to which it is seeking to convert, including when the mechanics for dismissal or conversion set forth in the chapter to which the debtor seeks to convert, including dismissal for bad faith conduct.  *See Marrama v. Citizens Bank*, 549 U.S. 365, 373-74 (2007) (citing 11 U.S.C. § 706(d)). "In practical effect, a ruling that [a debtor's] case should be ***dismissed*** … because of prepetition bad-faith conduct… is tantamount to a ruling that the individual ***does not qualify as a debtor*** under [that Chapter]." *Id.* (emphasis added). Where, as here, the Petitioning Creditors commenced this Chapter 7 Case, not NecoSage, there can be no argument that *NecoSage* filed for bankruptcy protection in bad faith, warranting dismissal.  And certainly, the Petitioning Creditors, having commenced this bankruptcy case, do not believe that this case should not be in bankruptcy (albeit in a Chapter 11 reorganization that will mazximize value for all the creditors of the Debtor and its affiliates, and in a proper venue).

chapter 11 … at any time … [o]n request of a party in interest," conversion to chapter 11 is appropriate where it is in the best interest of all parties.  *See* 11 U.S.C. § 706(b).

57.     Here, NecoSage has a right to convert this case to a case under chapter 11, and doing so is in the best interests of all parties.  Since at least early December, NecoSage has been working, with the counsel of G&M and the CRO, to develop a restructuring process that will maximize value for the benefit of all constituencies.  With the help of the CRO, NecoSage has secured a lender willing to provide debtor-in-possession financing to fund a chapter 11 case.  G&M has prepared filings and financing documentation to commence an expeditious chapter 11 case.  In short, NecoSage has the advisors, the funding, and the game plan to commence a successful reorganization in chapter 11 as soon as this case is converted, to the benefit of all creditors.

**b.      Venue is Improper in this Court and the Converted Chapter 11 Case Should be Transferred to the Delaware Bankruptcy Court where NecoSage's Subsidiary Has a Pending Chapter 11 Case.**

58.     Venue is improper in this Chapter 7 Case because NecoSage has no meaningful connection to North Carolina.  Instead, this Chapter 7 Case should be transferred to the Delaware Bankruptcy Court, where NecoSage's affiliate, Urban Red, is already a chapter 11 debtor.

59.     Generally, for a corporate debtor, a bankruptcy case may be commenced in the district "in which the principal place of business in the United States, or principal assets in the United States, of" the debtor are located [.]"  28 U.S.C. § 1408.  Courts tasked with determining where a debtor's principal place of business is located employ the "nerve center" test. *In re AnthymTV Co.*, 650 B.R. 261, 276-77 (Bankr. D.S.C. 2023) (citing *In re Baltimore Food, Sys. Inc.*, 71 B.R. 795, 800-01 (Bankr. D.S.C. 1986)).

60.     The Supreme Court has stated that "in practice [the principal place of business] should normally be … the actual center of direction, control, and coordination, i.e. the "nerve center," ***and not simply an office where the corporation holds its board meetings***[.]"  *Hertz Corp*

20

*v. Friend*, 559 U.S. 77, 80 (2010) (emphasis added); *see also In re Peachtree Lane Assocs.*, 198 B.R 272, 283 (Bankr. N.D. Ill. 1996), *aff'd* 206 B.R. 913 (N.D. Ill. 1997), *aff'd* 150 F.3d 788 (7th Cir. 1998) (holding that debtor's principal place of business was in the Northern District of Illinois because the debtor's significant business decisions were made by its executives who had offices in Chicago and Long Grove, Illinois, notwithstanding that the debtor's asset, an apartment complex, was located in Texas, or that the debtor's property manager for the complex was located in California).

61.    Here, NecoSage's principal place of business is not in North Carolina. NecoSage's "nerve center" is in Pakistan, where all of its business operations are run. NecoSage's Head of Operations & People, Head of Financial Planning & Analysis, Senior Manager of Investor Relations, Business Development Manager, Head of Accounts, and Senior Legal Associate all operate from Pakistan. NecoSage's CRO operates from his office in Florida. And NecoSage is or was, until recently, also supported by individuals located in Georgia, Arizona, Florida, Pennsylvania, New York, and New Mexico. Currently, NecoSage's *only* connection to North Carolina is Cheema, who role has been supplanted by that of the CRO.

62.    Moreover, even if this case were filed in a proper district and by three eligible creditors (which it was not), the Court would nevertheless be empowered to transfer the case to another district "in the interest of justice or for the convenience of the parties." Fed. R. Bankr. P. 1014(a); 28 U.S.C. § 1412. Courts consider a variety of factors in determining if transferring venue will be in the interest of justice, including:

> (1) whether transfer promotes the economic and efficient administration of the bankruptcy estate; (2) whether transfer facilitates judicial economy; (3) the parties' ability to receive a fair trial in either venue; (4) whether either forum has an interest in deciding controversies within its jurisdictional borders; (5) whether transfer would affect the enforceability of any judgment rendered;

and (6) whether the debtor's original choice of forum should be disturbed.

*In re Bestwall LLC*, 605 B.R. 43, 51 (Bankr. W.D.N.C. 2019) (citing *Brown v. Wells Fargo, NA*, 463 B.R. 332, 338 (M.D.N.C. 2011). Ultimately, the key consideration is "whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness." *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990); *see also Yolo Capital, Inc. v. Normand*, No. 1:17-CV-00180-MR DLH, 2018 U.S. Dist. LEXIS 13083, 2018 WL 576316, at *2 (W.D.N.C. Jan. 26, 2018) ("Not all of these [interest of justice] factors are weighed equally, however, as the most important of these factors is the economic and efficient administration of the estate.") (citing *Hilton Worldwide, Inc. v. Global Benefits Admin. Comm. v. Caesars Entm't Corp.*, 532 B.R. 259, 274 (E.D. Va. 2015)).

63.     In this case, all of the relevant factors, particularly the economic and efficient administration of the estate, weigh in favor of transferring this case to the Delaware Bankruptcy Court. Transferring this case to the Delaware Bankruptcy Court promotes the economic and efficient administration of the bankruptcy estate because NecoSage's case can be jointly administered with its subsidiary in Delaware, Urban Red. Such a transfer is timely, as an order of relief has not been entered in the above-captioned involuntary case. A transfer also facilitates judicial economy, as joint administration means that only one court will have to calendar conferences and hearings, maintain a docket, and become familiar with the facts of and make decisions in the jointly administered chapter 11 cases.

64.     Additionally, all parties will receive a fair trial in either venue and transferring this case to the Delaware Bankruptcy Court will not affect the enforceability of any judgment rendered. There is no specific reason why this court would have an interest in hearing this case; in fact, only one of the three Petitioning Creditors is located in North Carolina, while the other two are in Illinois

and California.  Additional creditors and parties in interest are disbursed throughout the United States, and the rest of the world.  Finally, transferring venue will not disturb *the debtor's* original choice of forum, because this case was commenced with an involuntary petition.  On the contrary, transferring venue to the Delaware Bankruptcy Court will permit the Alleged Debtor to proceed in its choice of forum.

65.     This case should thus be transferred to the Delaware Bankruptcy Court to promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness. *See Manville Forest Prods. Corp.*, 896 F.2d at 1391.

## CONDITIONAL CONSENT AND RESERVATION OF RIGHTS

66.     If this Court grants NecoSage's motion to convert this Chapter 7 Case to a case under chapter 11 of the Bankruptcy Code, then NecoSage consents to entry of an Order for Relief. For the avoidance of doubt NecoSage's consent to entry of an Order for Relief is expressly conditioned upon the conversion of this Chapter 7 Case to a case under chapter 11 of the Bankruptcy Code.

67.     NecoSage expressly reserves all of its rights and remedies under section 303 of the Bankruptcy Code and otherwise.


**WHEREFORE**, NecoSage respectfully requests that the Court (i) deny the relief requested in the Trustee Motion and the TRO Motion; (ii) dissolve the TRO; (iii) enter an order converting this Chapter 7 Case to a case under chapter 11 of the Bankruptcy Code and transferring venue to the Delaware Bankruptcy Court; (iv) solely upon conversion of this case to case under chapter 11 of the Bankruptcy Code, enter the Order for Relief; and (v) grant such other and further relief as is just and proper.

Dated: March 1, 2026                          */s/ Harley J. Goldstein*

Harley J. Goldstein, Esq.

*/s/ Ainsley G. Moloney*
Ainsley G. Moloney, Esq.

**GOLDSTEIN & MCCLINTOCK LLLP**
111 W. Washington Street, Suite 1221
Chicago, IL 60602
Telephone: (312) 337-7700
harleyg@goldmclaw.com
ainsleyg@goldmclaw.com

-and-

*/s/ Maria Aprile Sawczuk*
Maria Aprile Sawczuk
501 Silverside Road, Suite 65
Wilmington, DE 19809
Telephone: (302) 444-6710
marias@goldmclaw.com

*Attorneys for the Alleged Debtor*

*/s/ John A. Northen*
John A. Northen, Esq.
**NORTHEN BLUE, LLP**
1414 Raleigh Rd., Ste 435
Chapel Hill, NC 27517
Telephone:  (919) 948-6823
jan@nbfirm.com

*Local Civil Rule 83.1(d) Attorney for Alleged
Debtor*

**<u>Exhibit A</u>**

# INVESTMENT MANAGEMENT AGREEMENT

This Investment Management Agreement (this "**Agreement**") is made and entered as of July 1, 2024, by and among Alliance Investments Management LLC, a Virginia limited liability company (the "**Investment Manager**"), and NecoSage, LLC, a Virginia limited liability company (the "**Company**").

**WHEREAS**, the Company desires to retain the Investment Manager to provide certain advisory and consulting services upon the terms and conditions hereinafter set forth, and the Investment Manager is willing to undertake such obligations.

**NOW, THEREFORE**, in consideration of the foregoing and the mutual and dependent covenants hereinafter set forth, the parties agree as follows:

1.      <u>Appointment</u>. The Company appoints the Investment Manager as investment adviser with respect to the Company's assets for the period and on the terms set forth in this Agreement, and the Investment Manager accepts such appointment.

2.      <u>Authority and Duties of the Investment Manager</u>.

    (a)    The Investment Manager agrees to furnish continuously an investment program for the Company. In this regard the Investment Manager will (i) manage the investment and reinvestment of the Company's assets, (ii) determine what investments will be purchased, held, sold, or exchanged by the Company and what portion, if any, of the assets of the Company will be held uninvested, (iii) continuously review, supervise, and administer the investment program of the Company, and (iv) supervise and arrange the day-to-day operations of the Company.

    (b)    The Company constitutes and appoints the Investment Manager as the Company's true and lawful representative and attorney-in-fact, with full power of delegation (to any one or more permitted sub-advisers), in the Company's name, place and stead, to make, execute, sign, acknowledge, and deliver all subscription and other agreements, contracts, and undertakings on behalf of the Company as the Investment Manager may deem necessary or advisable for implementing the investment program of the Company by purchasing, selling, and redeeming its assets and placing orders for such purchases and sales.

    (c)    The Company may delegate to the Investment Manager, subject to revocation at the discretion of its board of managers, the responsibility for voting proxies relating to the Company's portfolio holdings.

    (d)    The Investment Manager agrees that it will discharge its responsibilities under this Agreement subject to the supervision of the board of managers of the Company and in accordance with (i) the terms hereof, (ii) the Company's operating agreement, (iii) the investment objectives, policies, guidelines, and restrictions of the Company, (iv) other applicable federal and state laws, and (v) any policies determined by the Company's board of managers, all of (i)-(v) hereof as from time to time in effect.

DocuSign Envelope ID: 8317898D-1340-425A-9E43-44D4B94613B5

(e)     Subject to the prior approval of a majority of the members of the board of managers ("**Managers**"), including a majority of the Managers who are not interested persons of the Company ("**Independent Managers**") and by the investors of the Company, the Investment Manager may, from time to time, delegate to a sub-adviser any of the Investment Manager's duties under this Agreement, including the management of all or a portion of the assets being managed. In all instances, however, the Investment Manager must oversee the provision of delegated services, the Investment Manager must bear the separate costs of employing any sub-adviser, and no delegation will relieve the Investment Manager of any of its obligations under this Agreement.

3.     <u>Fees</u>. The Company will pay to the Investment Manager, as compensation for the services rendered, facilities furnished, and expenses borne by the Investment Manager hereunder, a management fee (the "**Management Fee**"). The Management Fee is accrued daily and payable monthly. The Management Fee is calculated at the annual rate of two percent (2%) of the Company's average daily net assets. In the event the Investment Manager is not acting as such for an entire calendar quarter, the Management Fee payable by the Company for the calendar quarter shall be prorated to reflect the portion of the calendar quarter in which the Investment Manager is acting as such under this Agreement.

4.     <u>Expenses</u>.

(a)     Other than as specifically indicated in this Agreement, the Investment Manager shall not be required to pay any expenses of the Company. The Investment Manager shall bear its own operating and overhead expenses attributable to its duties hereunder (such as salaries, bonuses, rent, office and administrative expenses, depreciation and amortization, and auditing expenses). The Company is not responsible for the overhead expenses of the Investment Manager. The Investment Manager may from time to time agree not to impose all or a portion of its Management Fee otherwise payable under this Agreement and/or undertake to pay or reimburse the Company for all or a portion of its expenses not otherwise required to be paid by or reimbursed by the Investment Manager. Unless otherwise agreed, any Management Fee reduction or undertaking may be discontinued or modified by the Investment Manager at any time.

(b)     The Company will bear all of the legal and other out-of-pocket expenses incurred in connection with the organization of the Company and the offering of its interests. The Company will bear all of its ordinary administrative and operating expenses, including the Management Fee, risk management expenses, its ordinary and recurring investment expenses, including custodial costs, brokerage costs, interest charges, consulting fees, compensation of the Company's Managers who are not directors, officers, or employees of the Investment Manager or of any "affiliated person" (other than a registered investment company) of the Investment Manager, legal expenses, accounting and auditing expenses incurred in preparing, printing, and delivering all reports (including such expenses incurred in connection with any Company document) and tax information for members and regulatory authorities, and all filing costs, fees, travel expenses, and any other expenses which are directly related to the investment of the Company's assets. The Company will pay any extraordinary expenses it may incur, including any litigation

expenses. Nothing in this Section 4(b) shall limit the generality of the first sentence of Section 4(a) of this Agreement.

(c)    If applicable, the Investment Manager will place orders either directly with the issuer or with brokers, dealers, or placement agents selected by the Investment Manager. In the selection of such brokers or dealers and the placing of such orders, the Investment Manager will use its best efforts to obtain for the Company the most favorable price and execution available, except to the extent it may be permitted to pay higher brokerage commissions for brokerage and research services as described below. In using its best efforts to obtain for the Company the most favorable price and execution available, the Investment Manager, bearing in mind the Company's best interests at all times, will consider all factors it deems relevant, including by way of illustration, price, the size of the transaction, the nature of the market for the security, the amount of the commission, the timing of the transaction taking into account market prices and trends, the reputation, experience, and financial stability of the broker or dealer involved, and the quality of service rendered by the broker or dealer in other transactions. The Investment Manager will not be deemed to have acted unlawfully or to have breached any duty created by this Agreement or otherwise solely by reason of its having caused the Company to pay a broker or dealer that provides brokerage and research services to the Investment Manager an amount of commission for effecting a portfolio investment transaction in excess of the amount of commission another broker or dealer would have charged for effecting that transaction, if the Investment Manager determines in good faith that such amount of commission was reasonable in relation to the value of the brokerage and research services provided by such broker or dealer, viewed in terms of either that particular transaction or the Investment Manager's overall responsibilities with respect to the Company and to other clients of the Investment Manager as to which the Investment Manager exercises investment discretion. In no instance, however, will the Company's securities be purchased from or sold to the Investment Manager, or any "affiliated person" thereof, except to the extent permitted by the Securities and Exchange Commission or by applicable law.

5.    Other Activities and Investments.

(a)    The Investment Manager and its officers and employees shall devote so much of their time to the affairs of the Company as in the judgment of the Investment Manager the conduct of its business shall reasonably require, and neither the Investment Manager nor its affiliates shall be obligated to do or perform any act or thing in connection with the business of the Company not expressly set forth herein.

(b)    The services of the Investment Manager to the Company are not to be deemed exclusive, and the Investment Manager is free to render similar services to others so long as its services to the Company are not impaired thereby. To the extent that affiliates of, or other accounts managed by, the Investment Manager invest in investment funds or other types of investments that limit the amount of assets and the number of accounts that they will manage or where capacity or access to such investment opportunity is otherwise constrained, the Investment Manager may be required to choose between the Company and other accounts or affiliated entities in making allocation decisions. The Investment Manager will make allocation decisions in a manner it believes to be equitable to each

account. It is recognized that in some cases this may adversely affect the price paid or received by the Company or the size or position obtainable for or disposed by the Company. Nothing herein contained in this Section 5 shall be deemed to preclude the Investment Manager or its affiliates from exercising investment responsibility, from engaging directly or indirectly in any other business, or from directly or indirectly purchasing, selling, holding, or otherwise dealing with any investment funds or co-investments in portfolio companies for the account of any such other business, for their own accounts, for any of their family members, or for other clients.

(c)     It is understood that any of the investors, Managers, officers, and employees of the Company may be an investor, director, officer, or employee of, or be otherwise interested in, the Investment Manager, and in any person controlled by or under common control with the Investment Manager, and that the Investment Manager and any person controlled by or under common control with the Investment Manager may have an interest in the Company. It is also understood that the Investment Manager and any person controlled by or under common control with the Investment Manager may have advisory, management, service, or other contracts with other organizations and persons and may have other interests and business.

6.     Reports and Other Information. The Company and the Investment Manager agree to furnish to each other, if applicable, current confidential private placement memoranda, proxy statements, reports to investors, certified copies of their financial statements, and such other information with respect to their affairs as each may reasonably request. The Investment Manager further agrees to furnish to the Company, if applicable, the same such documents and information pertaining to any sub-adviser as the Company may reasonably request.

7.     Scope of Liability; Indemnification.

(a)     In the absence of willful misfeasance, bad faith, or gross negligence on the part of the Investment Manager, or reckless disregard of its obligations and duties hereunder, the Investment Manager shall not be subject to any liability to the Company or to any investor of the Company, for any act or omission in the course of, or connected with, rendering services hereunder. The Company shall, to the fullest extent permitted by law, indemnify and save harmless the Investment Manager, its affiliates, and any of their respective partners, members, directors, officers, employees, and investors (the "**Indemnitees**") from and against any and all claims, liabilities, damages, losses, costs, and expenses, that are incurred by any Indemnitee and that arise out of or in connection with the performance or non-performance of or by the Indemnitee of any of the Investment Manager's responsibilities hereunder, provided that an Indemnitee shall be entitled to indemnification hereunder only if the Indemnitee acted in good faith and in a manner the Indemnitee reasonably believed to be in or not opposed to the best interests of the Company; *provided*, *however*, that no Indemnitee shall be indemnified against any liability to the Company or its investors by reason of willful misfeasance, bad faith, gross negligence, or reckless disregard of the Indemnitee's duties under this Agreement.

(b)     Expenses, including reasonable counsel fees incurred by the Indemnitee (but excluding amounts paid in satisfaction of judgments, in compromise, or as fines or

penalties), shall be paid from time to time by the Company in advance of the final disposition of a proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay amounts so paid to the Company if it is ultimately determined that indemnification of such expenses is not authorized under this Agreement; provided, however, that (i) the Indemnitee shall provide security considered in the sole discretion of the Company to be appropriate for such undertaking; (ii) the Company shall be insured against losses arising from any such advance payments; or (iii) either a majority of the Independent Managers that are not parties to the proceeding, acting on the matter, or independent legal counsel in a written opinion, shall determine, based upon a review of readily available facts (as opposed to a full trial-type inquiry), that there is reason to believe that the Indemnitee ultimately will be found entitled to indemnification.

8. <u>Independent Contractor</u>. For all purposes of this Agreement, the Investment Manager shall be an independent contractor and not an employee or dependent agent of the Company; nor shall anything herein be construed as making the Company a partner or co-venturer with the Investment Manager or any of its affiliates or clients. Except as provided in this Agreement, the Investment Manager shall have no authority to bind, obligate, or represent the Company.

9. <u>Term</u>.

(a) This Agreement shall become effective as of the date of its execution.

(b) Unless otherwise terminated, this Agreement shall continue in effect until June 30, 2031, and from year to year thereafter so long as such continuance is specifically approved at least annually (i) by the board of managers of the Company or by vote of a majority of the outstanding voting securities of the Company, and (ii) by vote of a majority of the Managers of the Company who are not interested persons of the Company or the Investment Manager, cast in person at a meeting called for the purpose of voting on such approval.

(c) This Agreement may at any time be terminated on sixty days' written notice to the Investment Manager either by vote of the Managers of the Company or by vote of a majority of the outstanding voting securities of the Company.

(d) This Agreement shall automatically terminate in the event of its assignment.

(e) This Agreement may be terminated by the Investment Manager upon sixty days' written notice to the Company.

(f) Termination of this Agreement pursuant to this Section 9 shall be without the payment of any penalty.

10. <u>Amendment; Modification; Waiver</u>. This Agreement shall not be amended, nor shall any provision of this Agreement be considered modified or waived, unless evidenced by a writing signed by the parties hereto.

11.     Notices. Except as otherwise provided herein, all communications hereunder shall be in writing and shall be delivered by mail, hand delivery, or courier, or sent by telecopier or electronically to the requisite party, at its address as specified by such party.

12.     Governing Law. This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Virginia which are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder, and the conflict of law principles of such State.

13.     Counterparts. This Agreement may be executed in multiple counterparts all of which counterparts together shall constitute one agreement.

14.     No Strict Construction. The parties to this Agreement have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties, and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

[*Signature page follows.*]

**IN WITNESS WHEREOF**, the parties hereto have executed this Investment Management Agreement on the date first written above.

NecoSage, LLC

By _____
Name: Sufyian Moten
Title: Vice President


Alliance Investments Management LLC

By _____
Name: Farooq Cheema
Title: Manager

**<u>Exhibit B</u>**



Investor Relations <ir@vantorq.com>

## Necosage Group Update

1 message

**Investor Relations** <ir@vantorq.com>          Wed, Nov 12, 2025 at 12:00 PM
Cc: Brian Czupek <brian@vantorq.com>
Bcc: akbar@thejaffers.net, Akbar Jaffer <jaffer.akbar@gmail.com>, Anne Stevens <anne.c.stevens@outlook.com>, Ashwin
Bhave <bhave.ashwin@outlook.com>, Tasneem Moosa <operations@bayyinah.com>, Farrukh Saleem
<saleem.farrukh@gmail.com>, Meghbartma Gautam <skyspeak@gmail.com>, Mike Dienhart <mikedienhart@gmail.com>,
hamidsyr@aol.com, Haseeb Chowdhry <haseeb@triviumglobal.com>, hadia@huddpudd.com, Hina Hussain
<hina73@gmail.com>, Humaira Qureshi <humirunner@gmail.com>, Imran Chaudhri <im@chaudhri.net>, Khurram Agha
<kzagha@gmail.com>, Mansoor Mohsin <mansoor.mohsin@gmail.com>, michal filipowski <filipowski.michal@gmail.com>,
Nadeem Pathan <nadeemnadeem@yahoo.com>, Nauman Khan <naumankhan78@gmail.com>, Neel Desai
<neelvdesai1@gmail.com>, Olga Pozharskaya <olga.pozharsk@gmail.com>, Polina Ware <polina.ware@gmail.com>,
Raman Gulati <ramandeep.gulati@gmail.com>, Rehan Hamid <rehanh@gmail.com>, Rehan Rashid <rehanrd@gmail.com>,
Ali Shah <aliriazshah@gmail.com>, Banu Iqbal <banu.iqbal@gmail.com>, iqbal_banu@hotmail.com, musaghani@gmail.com,
Scott Sperling <scott.sperling@gmail.com>, salam10680@yahoo.com, Viqas Zafar <viqas.zafar@gmail.com>,
zafariqbaldc@gmail.com, Zeenat Iqbal <zeenat.iqbal@gmail.com>, Zeeshan Khan <khanzk07@gmail.com>, Pat McGlynn
<pmcglynn3618@gmail.com>, Hassan Mir <hmirwvu@gmail.com>, Essmaeel Abdel-Dayem <essmaeel@gmail.com>,
arifmasood1000@gmail.com, Vishal Suri <Vishal.suri@carpe-diem.net>, Jamshed Qamar
<jamshedqamar1124@yahoo.com>, Kashif Mueen <kashif.mueen@gmail.com>, Sadaf Wifey
<sadaf.kashif2002@gmail.com>, danial malik <danmalik89@gmail.com>, khalid mahmood <amfmsm123@gmail.com>,
Ghazenfer Mansoor <gmansoor@gmail.com>, mars.shah03@gmail.com, Zeeshan Huque <zeeshanhuque@gmail.com>,
Peter Zangari <peter.zangari@gmail.com>, Masood Malik <masoodm_99@yahoo.com>, abida nasreen
<abidanas2003@yahoo.com>, n786pk@gmail.com, Riaz Siddiqi <rsiddiqi1@gmail.com>, Abhay Jain
<jainabhay@gmail.com>, Shloak Jain <shloak@gmail.com>, Usman Zafar <usman.m.zafar@gmail.com>,
syednzaman@yahoo.com, Imran Shah <imranalishah39@gmail.com>, Afzaal Akhtar <afzaal@msetoinvest.com>,
zakif@yahoo.com, Yusuf Azaz <yusuf.azaz@gmail.com>, craig@mfdinvesting.com, Aqueel Pabaney
<ahpabaney@gmail.com>, Omer Malik <omerfmalik@gmail.com>, Rahul Prasad <rrprasad@mac.com>, Ahmed Nasrullah
<eyenaz@gmail.com>, david@rambhajan.com, "Ahmad R. Cheema" <ahmcheema@gmail.com>, Abdul Mannan
<doc.abdulmannan@gmail.com>, Aamir Siddiqui <aamir64@gmail.com>, Brian Gealey <bsgealey@gmail.com>,
sbangash22@gmail.com, Mala Britto <malabritto@yahoo.com>, Paul Brizzi <paul.j.brizzi@gmail.com>, Syed Furqan Zaidi
<syedfurqanzaidi@hotmail.com>, Tazeen Hashmi <tazeen@comcast.net>, docchotani@gmail.com, Bhrugu Pange
<bpange@gmail.com>, Jon <jcnorthville@gmail.com>, Drew Niv <drewn@tradertools.com>, Bryan Seastead
<bseastead@gmail.com>, Dilip Kumar <dilipkumar029@gmail.com>, Mohammad Zaheer <zaheer90@gmail.com>

Dear Investors,

We write with an important update on NecoSage LLC ("NecoSage" or the "Company").

You may have been made aware that NecoSage is in a severely distressed position and has critical liquidity
needs. If you have not already been updated by the Company, you may contact Investor Relations at your
earliest convenience to discuss your individual position and any specific questions that you have
(ir@vantorq.com).

Generally, due to various macro, operational, and legal challenges, the Company's asset portfolio is not able
to fund current operations and pay liabilities. To address this, the Company has been evaluating two primary
options: (1) a restructuring or (2) the sale of a significant asset, Eyes of Hope Home Health Care (EOH).
The Company has received and is considering two letters of intent ("LOIs") from potential buyers for the
asset.

Meanwhile, an ad hoc committee representing certain large investors in NecoSage has formed ("Investor
Committee") and the Investor Committee has expressly objected to the sale of EOH at this time. The
Investor Committee is concerned that the proposed sale price reflects a temporary downturn in EOH business
during the past quarter and therefore is undervalued. They believe the downturn is over and that it would be
more beneficial to stabilize operations and take steps to execute a more deliberate, managed sale of EOH,
hopefully at an increased sale price.

To do this, the Company requires immediate funding and the Investor Committee is considering providing this funding. The NecoSage Board is actively negotiating with the Committee regarding the funding terms, including a security interest in all NecoSage assets. The parties also are discussing a restructuring of the Company, under which certain assets (including EOH) would be transferred to a new entity managed by an independent board of directors, with all debt and equity holders of NecoSage retaining their same proportional rights to the assets. In parallel, the Board continues active discussions with potential strategic buyers for EOH and exploring ways to increase the value of another NecoSage asset, Emergent 1 Partners LLC (owner of "Urban Red"), through development and licensing of a proprietary artificial intelligence tool developed by the Urban Red team.

The Board has been meeting multiple times per week and is fully committed to its fiduciary duty to achieve the best possible outcome. We expect to adopt a definitive plan as quickly as circumstances allow.

**Finally, the Investor Committee has asked that we connect you with them as they continue working to align stakeholders and finalize the plan. The point of contact is Masood Malik (masoodm_99@yahoo.com) and you are encouraged to contact him directly.**

This is an extremely challenging period for our creditors, investors, employees, and partners. We sincerely appreciate your continued patience and support as we navigate these matters.

Regards

Thank you
Investor Relations Team

**<u>Exhibit C</u>**

# Necosage Emergency Meeting of Investors

## Strategic Options Analysis

November 2025

This analysis has been prepared based on available information and may not be complete. The information contained herein may include inaccuracies and should not be relied upon as the sole basis for any financial or business decisions. The information presented is unaudited. This presentation is confidential and proprietary. This presentation is intended to accompany an oral presentation and is not complete without it.

# Independent Restructuring Advisors: Introductions and Meeting Scope

### Who We Are

**Brett Walter** serves as General and Restructuring Counsel, bringing 25 years of specialized legal expertise to navigate complex restructuring processes and protect stakeholder interests.

**Michael DiRende** is our lead Restructuring Advisor with over 25 years of dedicated experience managing companies through financial stress and distress situations across multiple industries.

### Our Independent Position

We are **not company employees**. Our independence is fundamental to our role—we provide objective, unbiased analysis and recommendations focused exclusively on maximizing value for all stakeholders.

Our mandate is clear: identify and execute strategies that support **your recovery** and preserve enterprise value.

---

### We Acknowledge Your Frustrations

**We understand the concerns and frustrations many of you have regarding the Company's performance and management decisions. The losses you've experienced are significant ; We hear you, and that reality informs our work moving forward.**

### What This Meeting Will NOT Cover

| No Forensic Accounting | No Management Debates | No Individual Resolutions |
|---|---|---|
| We are not conducting forensic audits or historical financial investigations at this time. Our focus is forward-looking operational stability. | We will not respond to or relitigate past conversations, decisions, or disputes with management during this session. | This forum cannot address individual investor grievances or legal claims. Your legal standing and rights remain exactly as they were prior to this meeting. |

### Our Clear Mandate Moving Forward



#### Address Immediate Issues

Tackle urgent operational and financial challenges that threaten the Company's viability and your investment recovery.



#### Maximize Enterprise Value

Implement strategic actions designed to preserve and enhance the Company's overall value for all stakeholders.



#### Prioritize Your Recovery

Focus relentlessly on pathways that offer the strongest potential for stakeholder recovery and value realization.

Today's discussion centers on practical steps, transparent assessment of current conditions, and realistic pathways forward. We're here to provide clarity, not platitudes—and to work toward outcomes that support creditor and investor recovery.

# Critical Financial Crisis and Restructuring Options

**Review of Position**: Necosage is out of cash and faces collapse if immediate action is not taken.  If that happens, it will enter into an uncontrolled liquidation under Chapter 7 of the US Bankruptcy Code. Employees have been paid through Friday and have advised they are not able to work without assurance of payment.  Additionally, legal and financial advisors have not been paid and may stop working without adequate assurances of payment.

## Proposed Restructuring Plan

### Spin-off Emergent 1 into NEWCO

Create a new entity, NEWCO, to house Emergent 1 assets (Urban Red), allowing for focused investment and potential new funding without the burden of Necosage's legacy issues.

### Sale of Remaining Assets

Strategically liquidate non-core or less viable assets to generate immediate cash flow and reduce outstanding liabilities.

### Eyes of Hope Asset Feedback

The company was intending to sell the Eyes of Hope asset but received feedback from certain investors to not proceed with the sale as they viewed it as being undervalued.  Therefore the Board did not proceed with the transaction.

# Restructuring Options Around Urban Red Assets

To facilitate the restructuring of Urban Red Assets into a new entity (NEWCO),allowing the company to pursue an AI strategy that, if successful, could provide significant recovery, the following options are available:

## Restructuring Options

**Secure Funding & Stabilize**

- Secure funding to stabilize operations, then decide whether to sell Eyes of Hope or spin it out into a NEWCO alongside Urban Red.

- Wait for the asset to turn around its operations.

- Eyes of Hope 2024 EBITDA was $1.9M; 2025 EBITDA is expected to be approximately $750K.

Sell Eyes of Hope Now

- Sell Eyes of Hope immediately to secure cash for short-term business stabilization.

- Effectuate a spinout of Urban Red and an orderly wind-down of Necosage.

## Alternative

Chapter 7 Liquidation

- Transfer control of the company to a Chapter 7 trustee.

- Assets will be sold at auction.

- This option is likely to result in the least amount of recoveries for stakeholders.

# Eyes of Hope Sale Options Overview

## Sale Option 1

**No Funding Required, No Immediate Distributions If and until Earnout**

- Sale to Atlas group
- Initial Sale: $525K (70% of asset)
- Additional Earnout potential: up to $2,275K

## Sale Option 2

**Immediate Funding Required, certainty of cash at closing**

- Non-binding LOI with Alfa Equities
- Expected sale price: $1,750K
- 60-day timeline to proceeds

# Sale Option 1: Atlas Group Transaction

## No Funding Required, No Immediate Distributions If and until Earnout

### Initial Sale Structure (70% of asset) - $525K

The $525K will be utilized to stabilize Necosage, with **no distributions expected until an earnout**, as described below, is achieved. Cash is expected to be received in three payments:

| 01 | 02 | 03 |
|---|---|---|
| Initial cash at closing | Additional payment in two weeks from closing | Balance in 4 weeks from closing |
| $150K | $200K | $175K |

## Earnout Details

An additional earnout potential of up to **$2,275K** is available, **contingent** upon performance. This will be based on specific financial targets achieved during Q4 2025 and Q1 2026.

# Sale Option 2: Alfa Equities Transaction

## Immediate Funding Required, certainty of cash at closing

The company has entered in non-disclosure agreement with Alfa Equities. It received a non-binding LOI with the following financial terms subject to due diligence:

### Sale Price Calculation

Sale price based on 3.0X on 70% last trailing twelve months EBITDA. The company's TTM as of October is $833K

### Expected Cash at Closing

Based on above expected Cash at closing is approx. $1750 before closing costs

## Transaction Timeline

The proposed transaction involves a 60-day timeline to completion, broken down into two main phases:

01

### Due Diligence

30 days for comprehensive due diligence by Alfa Equities.

02

### Closing Period

30 days to finalize all legal and financial aspects and officially close the transaction.

# Comparison of Sale Options

| Factor | Option 1: Atlas Group | Option 2: Alfa Equities |
|---|---|---|
| Initial Cash | $525K (staggered payments) | $1,750K at closing |
| Additional Upside Potential | Up to $2,275K earnout | None - fixed price |
| Funding Required | No | Yes - immediate |
| Timeline to Cash | 4 weeks for full initial payment | 60 days |
| Certainty | Lower - earnout dependent on performance | Higher - cash at closing |
| Immediate Distributions | No, not until earnout | Yes, at closing |

# Critical Cash Needs

The Company is out of cash and faces collapse if immediate action is not taken and will enter into an uncontrolled liquidation, Chapter 7. **Employees have been paid through Friday and are threatening to quit if funding not secured to pay them for coming weeks. Additionally legal and financial advisors have not been paid therefore may stop working without adequate assurances of payment.**

## Immediate Cash Requirements(excludes wind-down costs of Necosage)

Draft – Work in Process

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 9-Nov-25 | 16-Nov-25 | 23-Nov-25 | 30-Nov-25 | 7-Dec-25 | 14-Dec-25 | 21-Dec-25 | 28-Dec-25 | 29-Dec-25 | 30-Dec-25 | 31-Dec-25 | 1-Jan-26 | 2-Jan-26 |
| **Net Cashflow Summary - See details in Appendix** | | | | | | | | | | | | | |
| Cash Inflow from Ops | - | 56,971 | - | - | - | 50,000 | - | - | - | 50,000 | - | - | - |
| Funding | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Inflows** | - | 56,971 | - | - | - | 50,000 | - | - | - | 50,000 | - | - | - |
| **Disbursements** | | | | | | | | | | | | | |
| Employee's & Contractors | 60,300 | 18,243 | 34,200 | 25,118 | 33,200 | 18,243 | 40,075 | 20,118 | 10,500 | 27,818 | 10,500 | 27,818 | 4,500 |
| Vendor Disbursements | 93,105 | 51,000 | 15,000 | - | 23,700 | - | 15,500 | - | 20,000 | - | 15,500 | - | 10,000 |
| **Total Disbursements** | 153,405 | 69,243 | 49,200 | 25,118 | 56,900 | 18,243 | 55,575 | 20,118 | 30,500 | 27,818 | 26,000 | 27,818 | 14,500 |
| Net Cashflows | (153,405) | (12,272) | (49,200) | (25,118) | (56,900) | 31,758 | (55,575) | (20,118) | (30,500) | 22,183 | (26,000) | (27,818) | (14,500) |
| Accumulated Net Cashflows | (153,405) | (165,677) | (214,877) | (239,994) | (296,894) | (265,137) | (320,712) | (340,829) | (371,329) | (349,147) | (375,147) | (402,964) | (417,464) |

# Next Steps

1. We recommend that a creditors' committee be formed to represent the group.

2. This committee will work with the company's professionals to develop proposals that will be presented to the board for approval.

3. Board decision on one of the options presented.  (Guided by Creditor input.)

# Appendix

1.  Cash Flow Details
2.  Organizational Chart

# NecoSage 13- Week Cash Flow

**Draft – Work in Process**

| NecoSage CashFlow | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| In US Dollars | 9-Nov-25 | 16-Nov-25 | 23-Nov-25 | 30-Nov-25 | 7-Dec-25 | 14-Dec-25 | 21-Dec-25 | 28-Dec-25 | 4-Jan-26 | 11-Jan-26 | 18-Jan-26 | 25-Jan-26 | 1-Feb-26 |
| Shared Services Billing ( from subs) | - | 56,971 | - | | | 50,000 | | | | 50,000 | - | - | - |
| Asset Sale/Funding | | | | | | | | | | | | | |
| **Total Cash Receipts** | - | 56,971 | - | - | - | 50,000 | - | - | - | 50,000 | - | - | - |
| **Critical Employees/Contractors** | | | | | | | | | | | | | |
| Pakistan-Aiman Atfab & Qamar Atfab (Investor Relations) | | 861 | | 861 | | 861 | | 861 | | 861 | | 861 | |
| Pakistan-Mohsin Ali (Accounts) | | 255 | | 255 | | 255 | | 255 | | 255 | | 255 | |
| Pakistan-Muhammad Haseeb Asif (Legal) | | 276 | | 276 | | 276 | | 276 | | 276 | | 276 | |
| Pakistan- Muhammad Hussain (Operations) | | 1,900 | | 1,900 | | 1,900 | | 1,900 | | 1,900 | | 1,900 | |
| Pakistan-Muhammad Sannan Tahir (FP&A) | | 2,000 | | 2,000 | | 2,000 | | 2,000 | | 2,000 | | 2,000 | |
| Pakistan-Muhammad Haseeb Asif (Legal)  Usman Ahmed Cheema | | 451 | | 451 | | 451 | | 451 | | 451 | | 451 | |
| Pakistan- Asif (Legal) Haider/Board Mem (Notice given till Dec 15) | | 5,000 | | 5,000 | | 5,000 | | | | | | | |
| USA-Harry Haus (Controller) | 3,000 | | 3,000 | | 2,000 | | 2,000 | | 2,000 | | 2,000 | | 2,000 |
| USA-Greg Snow (US Operations Lead) | | | | 6,875 | | | 6,875 | 6,875 | | 6,875 | | 6,875 | |
| USA-Brett Walter & Valeska Suarez (General Counsel & Paralegal) | 15,200 | | 15,200 | | 15,200 | | 15,200 | | | 15,200 | | 15,200 | |
| USA  Brett Walter (past due) - General Counsel | 25,000 | | | | | | | | | | | | |
| USA- Mike DiRende (Restructing / Advising: Hourly Basis) | 8,600 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | | | | | |
| USA-Brian Czupek (Investor Relations) | 2,500 | | 2,500 | | 2,500 | | 2,500 | | 2,500 | | 2,500 | | 2,500 |
| USA  Mateen Asif (Operations) | 6,000 | | 6,000 | | 6,000 | | 6,000 | | 6,000 | | 6,000 | | |
| **Total Employee & Contractors** | 60,300 | 18,243 | 34,200 | 25,118 | 33,200 | 18,243 | 40,075 | 20,118 | 10,500 | 27,818 | 10,500 | 27,818 | 4,500 |
| CBH Tax accountants ( Past Due) | 10,000 | | | | 10,000 | | 10,000 | | 10,000 | | 10,000 | | |
| External Legal Incurred Fees | 30,000 | | 10,000 | | | | | | | | | | |
| Software/Subscrips | 4,905 | - | - | - | 2,000 | - | 500 | - | - | - | 500 | - | - |
| Utilities | - | 1,000 | - | - | 500 | - | - | - | - | - | - | - | - |
| Insurance | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 |
| Office Exp - Rent | 1,200 | - | - | - | 1,200 | - | - | - | - | - | - | - | - |
| Short Term Loan Return | - | 50,000 | - | - | - | - | - | - | - | - | - | - | - |
| **Critical IT pasdue** | 42,000 | - | 5,000 | - | 5,000 | - | 5,000 | - | 5,000 | - | 5,000 | - | 5,000 |
| **Vendor Disbursements** | 93,105 | 51,000 | 15,000 | - | 23,700 | - | 15,500 | - | 20,000 | - | 15,500 | - | 10,000 |
| **Total Disbursements** | 153,405 | 69,243 | 49,200 | 25,118 | 56,900 | 18,243 | 55,575 | 20,118 | 30,500 | 27,818 | 26,000 | 27,818 | 14,500 |
| Net of Cashflow | (153,405) | (12,272) | (49,200) | (25,118) | (56,900) | 31,758 | (55,575) | (20,118) | (30,500) | 22,183 | (26,000) | (27,818) | (14,500) |
| **Cumulative Net Cashflow** | | (165,677) | (214,877) | (239,994) | (296,894) | (265,137) | (320,712) | (340,829) | (371,329) | (349,147) | (375,147) | (402,964) | (417,464) |

# Organizational Chart



**<u>Exhibit D</u>**

<u>**Meeting Minutes**</u>
**Meeting of the Board of Managers**
**NecoSage, LLC (the "Company")**
**12/3/2025**

**1.    Call to Order**

The meeting was called to order by Farooq Cheema (**"FC"**) (Director and chairman of the meeting).

FC noted that the meeting was convened at 10:45am ET on December 3, 2025 by video conference (Google Meet). In attendance were FC, Qamar Abbas (**"QA"**), and Muhammad Hussain (**"MH"**). FC noted that the Company legal counsel, Brett Walter (**"BW"**), was present and would act as Secretary of the meeting.

**2.    Determination of Quorum**

FC noted that a quorum was present in accordance with the Company's operating agreement. QA and MH were introduced as new Members of the Board, having been appointed by the Sponsor Member pursuant to the terms of the Company's operating agreement. Aakaf Ahmad having served upon the appointment of the Sponsor Member had been removed from the Board by the Sponsor Member, pursuant to the terms of the Company's operating agreement. Ammar Haider has submitted his resignation from the Board.

**3.    Approval of Agenda**

The members agreed to the agenda that was circulated prior to the meeting. They also agreed to waive the notice requirement for the meeting, as stated in the operating agreement.

**4.    Matters for Discussion and Approval**

FC led the members through the discussion of issues.

**a.    President of the Company**

Last month, in November, FC resigned as the President of the Company but agreed to continue serving as a Director. For administrative, operational, and leadership reasons, he proposed that he should resume his role as President. He explained that the Company requires an executive decision maker for day to day operations and in the current challenging conditions this is even more essential. The Board discussed that FC will not be paid a salary for resuming as the President of the Company.

Upon motion, which was seconded, the Board approved the retention of FC as the Company President. He will also maintain his seat on the Board in the role reserved for the President, as set out in the Company operating agreement.

**b.    Emergency Funding**

FC explained that the Company's revenue is not sufficient to meet its payroll or basic operational obligations, including IT support, accounting, legal, and compliance costs. These costs have been substantially reduced over the past few months, and now consist of a small group of employees in Pakistan and a small number of independent contractors in the U.S.

Over the past month, executives and advisors of the Company met with groups of creditors and investors to explain the Company's distressed financial condition. They had explained that the Company did not have sufficient revenues to meet operational costs and therefore was

1

exploring a sale of an asset within the group, the interest in Eyes of Hope Home Health LLC. The proposed sale was opposed by groups of creditors and the Board agreed to cancel the sale process as a result; instead the Board voted to hold a meeting for all investors and creditors at which BW and Mike Dirende (restructuring consultant) (**"MD"**) presented, proposed that the creditors and investors form one or more committees, and consider an emergency funding option as soon as possible. The Board is aware that a committee was formed and limited discussions were held involving BW, MD, and FC at various times, but to date a funding proposal has not been made to the Board.

As a backstop, while waiting for the committee to decide if it would make a proposal, FC explained that he had been negotiating emergency funding, and draft transaction documents had been finalized. The documents expressly note that the funding is to be provided to fund specified, necessary operating costs of the Company, with a portion of the funding to be used for professional advisors to advise the company. The funding also would be used to pay payroll. Having no other options for funding, FC recommended that the Board consider and approve this emergency funding.

FC explained that the terms of the emergency funding will involve very stringent collateral terms, in which FLC will be the borrower and the Company, Eyes of Hope Holdings LLC, Eyes of Hope Home Health Care LLC, and Emergent 1 Partners LLC and Urban Red LLC will guarantee the payment obligations and pledge their equity interests in assets to the lender if there is a default. In addition, these entities will provide restrictive affirmative and negative covenants, giving the lender a high degree of control over the entities. FC explained that given the Company's payroll and other immediate obligations, he did not perceive another option; and he advised his view that it is in the best interest of the Company to take the deal which would allow it to move forward with an orderly winding up.

The Board Members had received the draft loan documents in advance. They considered numerous questions about the documents, including questions about how the collateral, pledges, and guarantees will work; the effect of the transaction on the position of creditors and equity holders; and the plan for the Company after receiving emergency funding. The Members reviewed the documents and BW was asked to respond to various questions about the legal effect of the documents. FC then explained that he has held preliminary discussions with professional bankruptcy advisors and they are ready to engage to help the Company consider options and move forward. FC stated that despite the risks and the strong terms of the loan, the Company had no other funding options and he recommended to the Board that they approve the transaction.

Upon motion duly made and seconded, the Board approved the emergency funding and instructed FC to take the necessary actions to execute the agreements.

c. **Bankruptcy Advisors**

FC noted that the emergency funding specifically earmarked amounts for engagement of bankruptcy legal counsel and a specialist restructuring advisor. The Board discussed the potential bankruptcy process and FC explained what he had learned in the prior weeks from discussions with various professional advisors.

Upon consideration and motion duly made and seconded, the Board approved the engagement of bankruptcy legal counsel and a specialist restructuring advisor. FC was directed to instruct

2

the advisors to consider, recommend, and prepare a bankruptcy application based on their best determination under the applicable laws and in the best interests of the Company.

5. **Any Other Business**
   FC asked the members if there was any other business to discuss.  It was determined that there was none.

6. **Adjournment**
   FC adjourned the meeting.

**DATE: December 3, 2025**

**SEEN AND AGREED BY:**

**BOARD OF MANAGERS:**

| <u>Name</u> | <u>Signature</u> |
|---|---|
| **Farooq Cheema** | _____ |
| **Muhammad Hussain** | _____ |
| **Qamar Abbas** | _____ |

**CONSENT OF SPONSOR MANAGER**

**SIMORQ CAPITAL, LLC**

By: _____

Name: Farooq Cheema

Title: Manager

**Exhibit E**

## URBAN RED LLC

## CONSENT TO ACTION WITHOUT MEETING

### (Board of Managers)

This <u>Consent to Action Without Meeting</u> (this "Consent") is made and executed as of <u>January 18,</u> <u>2026</u> (the **"Effective Time"**) by the undersigned (each, a **"Manager"**) of Urban Red LLC, a Delaware limited liability company (the **"Company"**), pursuant to the Company's Limited Liability Company Operating Agreement dated as of March 28, 2023 (the **"Operating Agreement"**) and the Delaware Limited Liability Company Act, as amended (the "Act").

### 1. Authority; No Meeting

The Managers make up the Board of Managers authorized to approve the actions set forth in this Consent. This Consent is adopted and approved without a meeting pursuant to: (a) Section 5.5.12 of the Operating Agreement (action by the Board of Managers without a meeting by written consent of  seventy-five percent (75%) of all Managers), and (b) Section 5.5.12 of the Operating Agreement (action by the Class A Managers without a meeting by unanimous written consent of all Class A Managers).  In addition, the sole member of the Company has provided its approval of this Consent.

### 2. Recitals

WHEREAS, the Managers have determined that it is advisable and in the best interests of the Company to approve the actions and resolutions set forth below; and

WHEREAS, the Managers desire to authorize the Company and its authorized representatives to take all actions necessary or advisable to implement the resolutions below.

### 3. Resolutions

NOW, THEREFORE, BE IT RESOLVED, that, in the judgment of the Managers, it is desirable and in the best interest of the Company, its creditors, members, and other interested parties to file a petition (the "*Petition*") seeking relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"), Subchapter V, in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*");

RESOLVED FURTHER, that Albert Kirchhein and AK Restructuring LLC shall be, and hereby is, employed as Chief Restructuring Officer for the company in the Company's chapter 11 case and Albert Kirchhein shall serve as the Authorized Representative (the "*Authorized Representative")* for the Company for all matters involved in the Company's chapter 11 case;

RESOLVED FURTHER, that the Authorized Representative shall be, and hereby is, authorized, directed, and empowered on behalf of and in the name of the Company to execute, verify, and cause to be filed such requests for relief from the Bankruptcy Court as the Authorized Representative may deem necessary, proper, or desirable in connection with the Petition, including any supporting declarations;

RESOLVED FURTHER, that the Authorized Representative is authorized to execute and file on behalf of the Company all petitions, schedules, lists, and other motions, papers, or documents, and to take any and all action that it deems necessary or proper to obtain appropriate relief for the Company, including, without limitation, any action necessary to maintain the ordinary course operation of the Company's business;

RESOLVED FURTHER, that the law firm of Goldstein & McClintock LLLP shall be, and hereby is, employed as general bankruptcy counsel for the Company in the Company's chapter 11 case;

RESOLVED FURTHER, that the Authorized Representative, and any employees or agents (including counsel) designated by or directed by such Authorized Representative, shall be, and each hereby is, authorized and empowered to cause the Company to enter into, execute, deliver, certify, file, record, and perform such agreements, instruments, motions, affidavits, applications for approvals or rulings of governmental or regulatory authorities, certificates, or other documents, and to take such other actions as, in the judgment of such Authorized Representative, shall be necessary, proper, and desirable (i) to prosecute to a successful completion the Company's chapter 11 case, (ii) to effectuate the restructuring of the Company's debt and other obligations, organizational form and structure, and ownership of the Company and its assets, consistent with the foregoing resolutions, and (iii) to carry out and put into effect the purposes of and the transactions contemplated by the foregoing resolutions; and

RESOLVED FURTHER, that all actions heretofore taken by the Authorized Representative or of the Company in connection with or otherwise in contemplation of the transactions contemplated by any of the foregoing resolutions be, and hereby are, ratified, confirmed, and approved.

IN WITNESS WHEREOF, the undersigned has executed this action by written consent as of the date first written above.

**THE BOARD OF MANAGERS (URBAN RED LLC)**

Signed by:

*Farooq Cheema*

Farooq Cheema (Manager)

Signed by:

*Muhammad Hussain*

Muhammad Hussain (Manager)

**With Consent:**
**Emergent 1 Partners LLC (Sole Class A Member of the Company)**

By: *Farooq Cheema*

Name: Farooq Cheema
Position: Manager

**<u>Exhibit F</u>**

# V VANTORQ
### CAPITAL MANAGEMENT

Vantorq Counsel **<legal@vantorq.com>**

## NecoSage LLC

From: Vantorq Counsel <legal@vantorq.com>
Date: Fri, Dec 12, 2025, 6:18 PM
Subject: NecoSage LLC
To: Mike Dienhart  <mikedienhart@gmail.com>

Dear Sir or Madam:

The Company has been informed that you have been in discussions with other parties who have contractual relationships with NecoSage LLC ("NecoSage") in, without limitation, an intentional attempt to detrimentally impact NecoSage and its business or operations. Please be advised that NecoSage possesses causes of action, rights to recoupment and set-off, and defenses on the basis of, without limitation, intentional interference with contract, intentional interference with prospective business advantage and defamation, to any claim you may have against NecoSage. NecoSage accordingly disputes some or all of any amount that you assert is owed to you by NecoSage.

NecoSage hereby reserves all of its rights and remedies

**<u>Exhibit G</u>**

**V VANTORQ**
CAPITAL MANAGEMENT

Farooq Cheema <farooq@vantorq.com>

---

## Concerns and next steps
3 messages

---

**Farooq Cheema** <farooq@vantorq.com>                                         Wed, Sep 17, 2025 at 2:05 PM
To: Tommy Kim <tommy@vantorq.com>
Cc: Gregory Snow <gregory@vantorq.com>, Brett Walter <brett@vantorq.com>

Hi Tommy,

I need to raise several concerns that require immediate attention. Recently, you have missed key meetings, including Saturday's session, and you were unavailable in the office yesterday when important matters needed discussion. Even when I reached out, your response came hours later. You are also still arriving late to routine meetings, which disrupts workflow and momentum.

In addition, your conduct in meetings has become counterproductive. Yesterday's IR meeting was derailed from the agenda and diverted into unrelated partnership issues, discussed in front of parties not appropriate for that conversation. An effective leader would not air grievances with team members who have no ability to address them; true leadership is raising concerns directly with those who can act on them. Distracting the team with personal grievances was unprofessional and damaging to focus. Matters of partnership concern should be addressed with Brett or myself only.

Further, the IR team is behind on critical goals, and your approach has contributed to the disruption of their work. For instance, the slide deck for the Hina group is still not ready. This undermines our ability to engage effectively with investors.

**Going forward, I expect the following:**
1.  Be in the office on travel days, consistent with the rest of the team.
2.  Attend all meetings on time.
3.  Stay on agenda and do not derail meetings with unrelated topics.
4.  Discuss partnership issues only with Brett or myself.
5.  Focus on execution with investors and delivery of required materials.
6.  Demonstrate strong leadership by keeping the IR team motivated, ensuring Brian is onboarded promptly, and handling current investors effectively.

7.    Do not present narratives we have not aligned on. As I have pointed out before, some of your statements to investors about Necosage history have been inaccurate and insufficiently researched. Finally, in all communication, avoid dismissiveness toward investors and address their concerns respectfully.

This needs to be corrected immediately so we can move forward productively and stay on track with our commitments.

Thanks
Farooq
Sent from my iPad

---

**Farooq Cheema** <farooq@vantorq.com>                           Tue, Sep 23, 2025 at 9:48 PM
To: Jeff Sirianni <jeff@vantorq.com>

From an earlier email sent to him…

Sent from my iPad

Begin forwarded message:

> **From:** Farooq Cheema <farooq@vantorq.com>
> **Date:** September 17, 2025 at 2:05:18 PM EDT
> **To:** Tommy Kim <tommy@vantorq.com>
> **Cc:** Gregory Snow <gregory@vantorq.com>, Brett Walter <brett@vantorq.com>
> **Subject: Concerns and next steps**

[Quoted text hidden]

---

**Farooq Cheema** <farooq@vantorq.com>                           Mon, Nov 10, 2025 at 11:16 AM
To: Valeska Suarez Solis <valeska@vantorq.com>

---------- Forwarded message ---------
From: **Farooq Cheema** <farooq@vantorq.com>
Date: Wed, Sep 17, 2025 at 2:05 PM
Subject: Concerns and next steps
To: Tommy Kim <tommy@vantorq.com>
Cc: Gregory Snow <gregory@vantorq.com>, Brett Walter <brett@vantorq.com>

[Quoted text hidden]



Farooq Cheema <farooq@vantorq.com>

---

## Investors not being responded to

2 messages

---

**Farooq Cheema** <farooq@ainvestmentsm.com>                                     Thu, Mar 27, 2025 at 10:16 PM
To: Tommy Kim AIM <tommy@ainvestmentsm.com>
Cc: Gregory Snow <gregory@ainvestmentsm.com>

Tommy,

As anticipated, I've started getting investors reaching out taxes. Has the email communication to investors gone out on the taxes, as discussed earlier? If not, please ensure we have it sent out tomorrow.

Currently, current investors are asking to talk to someone at IR: Sadia Hussain (investors in UR and EDS) and Rabhea (investor in EDS) regarding their tax paperwork and other questions. Rabhea's monthly payment should be going out tomorrow.

But please have them contacted tomorrow . Aakif is not responding to them (per their statement) so someone intelligent please.

We really need to get ahead of the communication to the smaller investors before we end up playing defense in answering their individual questions.

Furthermore, with the further decline in cash coming in (I think total cash in from IR this month is $100k or less, which barely covers IR's own expenses), and with investor notes maturing coupled with no communication for IR, investors are getting antsy.

Thanks for you attention to the matter. I expect more such inquiries to be incoming if they are not hearing back from Aakif.

Happy to discuss further tomorrow if needed. But the communication to investors really needs to go out urgently. Only now, it should state who they can contact for inquiries. Aakif can't be that person anymore. Too many complaints.

Please do let me know status on them. And Nauman. I promised them they would hear from you or your team and owe them a followup personally.

Thanks for your attention to the matter.

Farooq
Sent from my iPhone

---

**Farooq Cheema** <farooq@ainvestmentsm.com>                                     Wed, Apr 2, 2025 at 2:05 PM
To: Tommy Kim <tommy@brandcapitalventures.com>

Tommy

I'm not getting replies from you. Are you checking AIM email? Have the investors been communicated with?

We really need to have better communication internally.

Farooq
Sent from my iPhone

Begin forwarded message:

>    **From:** Farooq Cheema <farooq@ainvestmentsm.com>
>    **Date:** March 27, 2025 at 7:16:19 PM PDT
>    **To:** Tommy Kim AIM <tommy@ainvestmentsm.com>
>    **Cc:** Gregory Snow <gregory@ainvestmentsm.com>

**Subject: Investors not being responded to**

Tommy,

[Quoted text hidden]



Farooq Cheema <farooq@vantorq.com>

---

## Distribute to Investors Q1 2025 (Latest)

3 messages

---

**Tommy Kim** <tommy@brandcapitalventures.com>                Wed, Apr 2, 2025 at 1:05 AM
To: Qamar Abbas <qamar@ainvestmentsm.com>
Cc: Ava Zhu <yz2759@columbia.edu>, Aakif Ahmad <aakif@ainvestmentsm.com>, Gregory Snow
<gregory@ainvestmentsm.com>, "tommy@ainvestmentsm.com" <tommy@ainvestmentsm.com>, Farooq Cheema
<farooq@ainvestmentsm.com>

Qamar

If no one has further comments to the Q1 2025 IR Newsletter by 4/2 Wed 12 Noon Eastern time, please distribute this version of the PDF only to investors.  Thank you.

Very Respectfully,
Tommy Kim

Brand Capital LLC – Brand Capital Ventures
M: 1 917 319 6450
E: tommy@brandcapitalventures.com
www.brandcapitalventures.com

---

**2 attachments**

 **IR Letter to Investors Q1 2025.pdf**
81K

 **IR Letter to Investors Q1 2025.docx**
21K

---

**Farooq Cheema** <farooq@ainvestmentsm.com>                Wed, Apr 2, 2025 at 2:03 PM
To: Tommy Kim <tommy@brandcapitalventures.com>
Cc: Qamar Abbas <qamar@ainvestmentsm.com>, Ava Zhu <yz2759@columbia.edu>, Aakif Ahmad
<aakif@ainvestmentsm.com>, Gregory Snow <gregory@ainvestmentsm.com>, tommy@ainvestmentsm.com

Tommy

I emailed you last week and share my concerns on bringing up CKS in the first newsletter I investors. Let's not do that.

Let's take out reference to CKS and keep focused on Necosage and new team. CKS can be brought up once its legal setup is done and we already have a rapport with investors. Otherwise they will get alarmed.

Farooq

Sent from my iPhone

> On Apr 1, 2025, at 10:05 PM, Tommy Kim <tommy@brandcapitalventures.com> wrote:

[Quoted text hidden]
<IR Letter to Investors Q1 2025.pdf>
<IR Letter to Investors Q1 2025.docx>

Cc: Farooq Cheema <farooq@vantorq.com>, Qamar Abbas <qamar@vantorq.com>, Brian Czupek <brian@vantorq.com>

So far he has not sued

Brett Walter
(202) 420-8060

[Quoted text hidden]

---

**Farooq Cheema** <farooq@vantorq.com>                                              Mon, Oct 20, 2025 at 8:49 PM
To: Tommy Kim <tommy@vantorq.com>
Cc: Qamar Abbas <qamar@vantorq.com>, Brian Czupek <brian@vantorq.com>, Brett Walter <brett@thegcglobal.com>

Tommy

I met with Danial. At no point did we have a concern of misrepresentations.

I'm going to ask you to be accurate on your statements to investors and in internal emails. There is a theme of exaggerating or generalizing statements. It's a theme I've seen from you, and investors have commented from you.

As a professional, please keep your communication accurate.

There have been multiple investors you have talked to privately with inaccurate statements made to them by yourself. Multiple investors over multiple interactions - made in your private communication with them.

I will not go into your intentions for doing so. But suffice it to say, please stop talking to investors until we have an internal discussion.

Refer investors to me, Brian and Qamar in the meanwhile.

Farooq
Sent from my iPad
[Quoted text hidden]

---

**Farooq Cheema** <farooq@vantorq.com>                                              Mon, Nov 10, 2025 at 11:08 AM
To: Valeska Suarez Solis <valeska@vantorq.com>

[Quoted text hidden]